Syllabus.

## [No. 2044.]

### John House v. The State.

1. THEFT — EVIDENCE — CONSENT.—INDICTMENT charged that Fred and John D. were the owners of the cattle alleged to be stolen. The proof showed that they had the possession, charge and control of the same. *Held*, that, under such circumstances, it was unnecessary to prove the consent of Andrew D., the real owner.

2. SAME — EVIDENCE. — The trial court, in a theft case, permitted a witness for the State to testify that he purchased certain cattle from the defendant, which cattle were taken from his pasture by the officers of the law and driven to the town of G., and there were penned in the court-house yard, and that Fred and John D. took some of them away from the court-house yard. *Held*, that the evidence was competent and admissible, in view of the other facts in proof.

3. SAME.— The defense reserved exception to the action of the court in permitting the sheriff to testify that he had received official notice that one S. had been released by other parties from the penitentiary, and was a refugee from justice. *Held*, that such evidence was admissible in view of the testimony of defendant's wife, who testified that, a short time before a man came to her house looking for stolen cattle, the said S. "brought some cattle to her husband's pen, put them into the pen and branded them."

4. SAME.— Statements of a defendant made after the commission of the offense, which are in effect self-serving declarations, are incompetent as evidence for the defense. Likewise are the statements of third parties, when mere hearsay. See the statement of the case for testimony properly excluded under this rule.

5. PRACTICE. — A bill of exceptions sets out that, when the prosecuting counsel interposed objection to leading questions propounded by counsel for the defense to a defense witness, the court replied: "Let him go on. I have cautioned him several times. I reckon the jury have sense enough to know whether the witness is telling the truth or not." The bill fails to show in what respect the rights of the defendant were prejudiced by the remark of the judge. *Held*, that such remark was not in the nature of a reflection upon the veracity of the witness, and constitutes no ground for reversal.

6. SAME — PRIVILEGE OF COUNSEL.— This court will reverse a conviction because in the trial the counsel for the State abused his privilege of debate, only when it appears, 1, that the remarks used in argument were improper, and, 2, that they were of a material character, and such as, under the circumstances, were calculated to injuriously affect the defendant's rights. See the opinion *in extenso*, and the statement of the case, for statements in argument *held* not to be such an abuse of privilege as to authorize the reversal of the judgment.

7. THEFT — CHARGE OF THE COURT.— See the statement of the case for a charge of the court which, considered in connection with the special charges given, presents correctly the law of theft as applied to the facts proved on this trial.

8. SAME — CIRCUMSTANTIAL EVIDENCE.— Failure to instruct the jury upon the law of circumstantial evidence is not error when the State is not relying

wholly upon that character of evidence. It is only when the inculpatory evidence is exclusively circumstantial that such charge is required.

9. Same—Fact Case.—See the opinion *in extenso*, and the statement of the case, for evidence *held* sufficient to support the venue of the offense, and otherwise to sustain a conviction for theft of cattle.

Appeal from the District Court of Gonzales. Tried below before the Hon. George McCormick.

The conviction in this case was for the theft of four head of cattle alleged to be the property of John and Fred Duderstadt, in Gonzales county, Texas, on the 5th day of January, 1883. The penalty assessed against the appellant was a term at two years in the penitentiary.

John Duderstadt was the first witness for the State. He testified that he was the John Duderstadt referred to in the indictment. Witness lived in Gonzales county. The cattle alleged in this indictment to have been stolen ranged in Gonzales county from four to six miles from the line of that county and Karnes and De Witt counties. The witness knew them by their flesh marks, and had never seen them out of Gonzales county. The witness knew equally well the mothers of the yearlings, which animals were still on the range near the Elm Mounds on Rocky creek in said Gonzales county. The witness last saw the yearlings, before they were stolen, in December, 1882, at which time witness placed his father's brand on them. That brand consisted of the letters L D,—the L being a large letter and the D a small one occupying the space in the angle of the L. Witness's father, Andrew Duderstadt, lived in Yorktown, De Witt county. Witness and his brother Fred had exercised exclusive charge and control over all cattle in the brand described since the close of the civil war. Witness's father, who was very old and infirm, had exercised no control over said cattle during the twenty years past, except a few of his cows that he kept at home from time to time to milk. During most of the time during the twenty years, the witness's father had been confined to his bed. He drove to witness's ranche in his wagon just before the present term of court commenced, and with a hand to assist him drove some milch cows to Yorktown. The cattle alleged to have been stolen were taken from their range in Gonzales county, Texas, in the spring of 1883. The witness learned that the sheriff of Gonzales county had some of his cattle in the court-house yard, and went to Gonzales to see about them. He found in the herd held by the sheriff the four head of yearlings mentioned in the indictment in this case. He knew them well by their flesh marks,

notwithstanding their brands had been blotched over, their tails bobbed, and their ear marks changed. The original brand was run over in a manner to make a device resembling somewhat the end elevation of an old-fashioned log cabin with window. The original ear marks were changed into the defendant's mark. The defendant was perfectly familiar with the Duderstadt mark and brand, and knew well who owned them. The cattle described were taken without witness's consent. Witness recovered the four head of yearlings at the court-house yard in Gonzales, Texas.

Fred Duderstadt, the next witness for the State, testified substantially as did his brother. He last saw the four head of yearlings mentioned in the indictment in February, 1883. They were then on their accustomed range in Gonzales county, sucking their mothers. On one occasion he saw one of the four yearlings a short distance across the county line, in the edge of De Witt county. The defendant lived between four and five miles from the section of country in which the yearlings ranged. Witness accompanied his brother John to Gonzales and they recovered the animals from the sheriff, who had them penned with others in the court-house yard. Witness identified them readily by their flesh marks. He had never consented that any one should take them.

John Wells was the next witness for the State. He testified that, together with other citizens, he "rounded up" Henry Trammel's pasture in Gonzales county, Texas, in June, 1883, and found the cattle described in the indictment with their brands blotched, their marks changed, and their tails bobbed. Witness knew the Duderstadt mark and brand, and traced them under the defendant's mark and brand, which he also knew. Those yearlings were placed in charge of Trafton and others, and sent to the town of Gonzales, and there turned over to the sheriff. While the witness and his party were rounding up the cattle in Trammel's pasture, the defendant, with one Wade and one Charles Kennedy, rode up to a point within fifty yards of the witness's party. Witness went to them, found them armed with pistols, disarmed them, arrested them, and sent them to jail. The witness saw the same cattle in Trammel's pasture some three or four weeks before this. The brands were then fresh. The brands were peeling off when the cattle were driven by Trafton and party to Gonzales. Witness at the same time found twenty-three head of cattle with blotched brands in the Henry Trammel pasture, and sent them all to Gonzales. The original brands on the Duderstadt cattle were covered by the fresh brand, blotching badly. Some were more blotched than others, and this

rendered it a difficult task to trace the new brand over the old. On each animal, however, the Duderstadt brand was traceable under the new brand.

James Trafton testified, for the State, that he was one of the party which rounded up the cattle in Henry Trammel's pasture, and was also one of the party which drove the cattle from said Trammel's pasture to Gonzales, and delivered them to the sheriff in the court-house yard.

Henry Trammel was the next witness for the State. He testified that, on or about the 1st day of April, 1883, he bought a bunch of about twenty head of yearlings from the defendant House. They were the same animals which were taken from the witness's pasture in Gonzales county, and driven to the town of Gonzales, by Mills and others in June, 1883. Witness bought those cattle at the defendant's pens, and Haldeman, who was a witness in this case, aided witness in driving them from the defendant's pen to the witness's pasture in Gonzales county. Defendant helped witness and Haldeman to drive them to a point a short distance beyond Powell's pen. The distance from the witness's pasture to the defendant's pens was about twenty miles. In taking the cattle to his pasture from the defendant's pens, the witness drove them along the public road, stopping one night at R. J. Kennedy's place. Witness was indicted for the theft of these cattle after they were found in his pasture. All of the indictments against witness which grew out of that raid on his pasture were afterwards dismissed by the district attorney. Witness was not familiar with the brands on the animals, and did not know that they were stolen when he bought them.

J. B. Haldeman testified, for the State, that he rode up to the cattle pens of the defendant on or about the 1st day of April, 1883, and saw the defendant in the pen branding a lot of cattle. The witness was requested by the defendant to dismount and aid him to rope and throw several of the animals. Witness did so, and discovered that defendant was putting his brand over other brands already on the cattle. Among those so branded by the defendant, the witness saw several yearlings in the Duderstadt brand. He called defendant's attention to the Duderstadt brand, and remarked to him: "They will catch you if you don't mind." Defendant replied: "D—n them, they stole their start," and that now he was "going to get away with them." Witness at the same time saw the defendant change the J L brand on several animals into the B U D brand. The defendant and the witness drove the cattle described to the Powell pasture. About a week after the occurrences

described, the witness saw Henry Trammel at the defendant's place, and saw the defendant sell Trammel the cattle on which he had seen him change the brands. After the said sale, witness assisted Trammel to drive the cattle to Trammel's pasture in Gonzales county. The defendant traveled a short distance with the witness and Trammel. Witness and Trammel stopped the first night with the cattle at R. J. Kennedy's place, and on the next evening reached Trammel's pasture.

This witness further testified that while he and the defendant were together in the Cuero jail, charged with the theft of these cattle, the defendant proposed to witness that if he, witness, would, on defendant's trial, swear that he, defendant, was not in Gonzales county with the cattle, he would pay the witness $50. Witness had never made any agreement with the district attorney to testify for the State in the cases growing out of the Trammel pasture raid, and was never indicted for the theft of the cattle which the defendant is charged to have stolen. The witness denied that, in talking to Arch Mimms, at Bob Still's house, in Bandera (?) county, about the defendant's trouble in connection with these cattle, he told the said Mimms that the authorities had got the wrong man, and that he, witness, was the man who got the money for those cattle. After the branding and sale of the cattle as related, the witness went from Gonzales to Bandera county, thence to Austin, and thence, in pursuance of a message received from the defendant, to Bandera. He denied that while in the Cuero jail he told Sam Hester, who was also confined in that jail, that he, the witness, was the man who got the cattle, and that the authorities had got the wrong man. The yearlings referred to by the witness were branded on the 10th day of February, 1883, by the defendant.

R. J. Kennedy was the next witness for the State. He testified that, about one month before the cattle raid on Trammel's pasture, Henry Trammel and J. B. Haldeman came to his house with a bunch of cattle, and penned them one night. Some time after this the defendant came to witness's house, and told witness that he was on his way to Trammel's house to see Trammel about some cattle he, defendant, had sold him. When he left he went in the direction of Trammel's place. Afterwards, on the very day that the raid on Trammel's pasture was made, the defendant stopped at witness's house and said that he understood that Trammel was about to get into trouble about the cattle that he, defendant, had sold him, and that he was going up to see about it; that he did sell Trammel the cattle, and that if he could get the cattle on the range again, "by

d—n" he would like to see any man try to take them away from him. The State rested.

Arch Mimms was the first witness for the defense. He testified that he met J. B. Haldeman in Medina (?) county, Texas, some time late in July or early in August, 1883, at Bob Still's place, and Haldeman, on that occasion, told witness that he, Haldeman, got the cattle for the theft of which the defendant was indicted, and that he, Haldeman, got the money for the same; and that the authorities had brought trouble on the wrong man so far as those cattle were concerned. Witness lived near the defendant's ranche; had hunted cattle with him and knew him well. At the time that the defendant got into this trouble, the witness was attending to stock on the range. Shortly after defendant's arrest the witness went to Bandera county to see a friend who was in trouble. That friend had a case in the justice's court. The witness was not attending to his friend's case during the whole of his visit to Bandera, but was, for a time, "staying around."

Mrs. House, the wife of the defendant, testified in his behalf that, on the 3d day of January, 1883, the defendant and one Wade left the defendant's house to go to the town of Cuero, to stand their trials for carrying pistols. On that same day J. B. Haldeman and Reinhardt Schneider brought some cattle to the defendant's pen, put them in that pen and branded them. That pen was situated about fifty yards from the defendant's house. Witness did not go out to the pens, nor did she ever inspect those cattle. She never saw the brands on them, and knew nothing about who owned them. Shortly after Schneider, who was a brother of the witness, and Haldeman, penned and branded the cattle as stated, a man came to the defendant's house looking for stolen cattle. Henry Trammel was several times at defendant's house about the time that Schneider and Haldeman penned those animals. The windmill on the defendant's place was a short distance from the cattle pens.

Fred House, the father of the defendant, was his next witness. He testified that about the middle of January, 1883, he saw a man near defendant's house, looking for stolen cattle. The witness was acquainted with the general reputation of J. B. Haldeman for truth and veracity in the community in which he lives, and it was bad. The witness was at the defendant's house nearly every day during the winter of 1882 and the spring of 1883. He had a windmill and well at the defendant's place, and had to watch it and keep it in order to supply his stock with water. The pen, during that winter and spring, inclosed the windmill and well. No cattle were

branded in that pen during the period mentioned. Mr. Ward came to see the witness during the time mentioned, and told witness that some stolen cattle had been driven in the direction of the defendant's house. The witness went with Ward throughout the county and aided him in his search for some cattle in the B U D brand. They found a few cattle in that brand. The brands were then commencing to peel. It requires from three to six weeks for a brand to peel. Defendant was not at home when Ward came to his house hunting cattle. He was in Cuero on trial for carrying a pistol.

William Burt, Senior, testified that Haldeman's reputation for truth and veracity was bad. W. Newman testified to the same effect; and, in addition, that he saw the defendant at Riddleville, ten or twelve miles from his home, in attendance upon a horse race on the 10th day of February, 1883,—the day on which Haldeman testified he branded the cattle at his pen.

The defense next introduced in evidence the judgment of the county court of De Witt county in the case of *The State of Texas* v. *John House*, charged with carrying a pistol. It was dated January 3, 1883. The defense closed.

W. E. Jones testified, for the State, in rebuttal, that he was sheriff of Gonzales county, and as such sheriff had official information of the escape of Reinhardt Schneider from the penitentiary, and offering a reward for his capture. This testimony, in connection with that of the witness Mrs. House, is the subject-matter of the third head-note of this report.

The defendant's fifth bill of exception, upon which is predicated the ruling announced in the fourth head-note of this report, omitting the formal parts, reads as follows: ". . . the State having proved by the witness Haldeman that on the 10th day of February, 1883, the defendant, assisted by said Haldeman, changed the brands upon the cattle in question, and the defendant having proved by the same witness that at the same time defendant and said witness changed the brand of J L of other cattle into B U D, and having further shown that same month, before the witness Fred House first saw the said cattle with their brands changed, one Ward came to said witness inquiring for certain lost cattle, and had put said witness on the lookout for said cattle, defendant offered to prove by said witness that, when he did find said cattle with their brands changed, having heard some intimation that the defendant was connected with said cattle in some way, he asked the defendant about the said cattle, when he denied all connection with or knowledge of the same, and that one Reinhardt Schneider told witness that they

need not be kicking about said cattle; that they were his property, and that he had bought them from J. B. Haldeman, and paid his money for them; and further, that said Schneider did claim said cattle. . . ."

The ruling embodied in the sixth head-note responds to objections urged by the defendant to certain statements made by the district attorney in the course of his address to the jury. The statements or remarks are set forth in the seventh, eighth and ninth bills of exception. The first recites and complains of language used by the prosecuting officer as follows: " Gentlemen: Myself and the county attorney, Mr. Atkinson, have been attacked for our mode of prosecution. There is this difference between the prosecution and the defense: The counsel for the defense in this case are representing renegades, thieves, murderers and cut-throats." To this bill of exception the judge appends an explanation as follows: "Given with this explanation: 'The counsel for the defendant had, in their remarks, been very severe upon the State's counsel, and in the opinion of the court the remarks of the district attorney were intended to refer to defendants generally and the class of clients on the criminal docket of the court.'"

The language of the district attorney used in his address to the jury, and complained of in the eighth bill of exceptions, was as follows: "The State of Texas might be raked over with a fine-toothed comb, and a more notorious character than the defendant John House could nowhere be found."

The ninth bill of exception, omitting the caption, reads as follows: " Be it remembered that in the closing remarks of the district attorney to the jury in this case he said: 'The witness Kennedy said that defendant stated to him that he understood that Trammel had gotten into trouble about those cattle he had sold him; that he was going up there to see about it, and if he could get the cattle back to his range, by d—n, he would like to see anybody take them. And the district attorney then stated further that no doubt the object of the defendant was to get the cattle back in his range, and then gather around him the thieves, cut-throats and robbers with whom. he associated, and defy the officers of the law when they attempted to take the stolen property from him; that the defendant would steal his neighbors' cattle and then gather around him cut-throats, thieves and robbers and defy the law.'" The bill of exceptions proceeds thus: " The court is of the opinion that the remarks of the district attorney were intended as explaining or as drawing his conclusions from the evidence, that the defendant had

said if he could get the cattle back from Trammel, by d—n, he would like to see anybody take them from him," etc.

This bill of exceptions further states: "And further, in the closing argument of the case, the district attorney said: 'Who is this Reinhardt Schneider that you have heard of in this case? He is a refugee from justice, and I might suppose that there is an oath of the defendant on file in this case in which he swears he wants a continuance to prove that he bought these stolen cattle from Reinhardt Schneider.' To all of which the defendant by his attorneys objected and excepted, because there was no evidence warranting the assertions of the district attorney, and because the remarks were calculated to prejudice the minds of the jury. Whereupon the court directed the district attorney to confine himself to the evidence in the case, when he further remarked to the jury: 'I did not say there was any affidavit on file; I only said I am going to suppose the fact. I do this to show what character of men are the associates of the defendant. I have proved by Captain Jones, the sheriff of your county, that Reinhardt Schneider is a refugee from justice.' To this, again, the defendant by his attorney excepted, and the defendant and the State having both presented a bill showing the matters complained of and excepted to, the court signs and gives the above in lieu of theirs, and orders this to be made a part of the record in this cause, which is done." (Signed by the judge.)

The charge of the court, which, in view of the evidence in the case, is approved by this court, and referred to in the seventh head-note, reads as follows:

"The defendant, John House, is on trial before you, charged by indictment with the theft of four certain animals of the species of neat cattle, the property of John Duderstadt and Fred Duderstadt; to which he has pleaded not guilty.

"Theft is the fraudulent taking of corporeal personal property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use and benefit of the person taking.

"It is not necessary that the ownership and possession of the property taken shall be in the same person at the time it is taken. If the property, when taken, is in the actual care, control and management of a party, so that he has a special property therein, the property may be alleged and proved to be in either the true owner or the party or parties holding such possession of the same.

"Conviction cannot be had upon the testimony of an accomplice,

unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense.

" The jury are further instructed that the testimony of one accomplice is not sufficient to corroborate the testimony of another, but that, in order to warrant a conviction on the testimony of accomplices, no matter how many there be who testify in a case, such evidence must be corroborated by other evidence which the jury believe to be true, tending to connect the defendant with the offense committed, and such corroboration is not sufficient if it merely shows the commission of the offense. Within the meaning of accomplice as used herein is meant principal and joint offenders, and all persons who may have participated in the commission of the offense under investigation, whether as principal offenders or in any other way connected therewith. If the evidence in this case shows that a witness or witnesses participated in the commission of the crime, either before, at, or after it was committed, such witnesses are accomplices, and their testimony must be corroborated before you can convict the defendant in this case.

" The jury are the exclusive judges of the facts proved, of the weight of the testimony, and of the credibility of the witnesses.

" A witness may be impeached by showing his general character for truth and veracity, or that he has made other and different statements out of court from those made on the trial. The object of this class of evidence is not to prove that what a witness says on a trial is untrue, but to show his unworthiness of belief, and it goes to the jury like all other evidence to be considered by them in arriving at a verdict.

" The law presumes every person accused of crime to be innocent, until his guilt is established to the satisfaction of those whose province it is to try him, beyond a reasonable doubt; and if you have such doubt in your mind of the defendant's guilt he is entitled to an acquittal.

" If, therefore, you believe from the evidence that the defendant, John House, did, as charged in the indictment, fraudulently take the cattle therein described, or either of said cattle, and that he so took them under such facts and circumstances as constitute theft, as theft is hereinbefore defined, then you will find the defendant guilty, and assess his punishment at confinement in the penitentiary for any term not less than two years nor more than five years.

" A fraudulent taking of property embraces the idea that the party taking it knows at the time that it is not his own, and that

he takes it with the intent at the time to deprive the owner of it, and appropriate it to his own use.

"The jury are further instructed that if the evidence shows that the animals described in the indictment were the property of the father of the parties alleged to be the owners in the indictment, and that the latter parties were in possession of the same when they were taken, then it devolves upon the State to show to your satisfaction that the animals were taken without the consent of the owner. This may be done either by direct evidence, or by the proof of such facts and circumstances as will convince you of the fact, you being the judges of the evidence on this point, as upon all others.

"If you find from the evidence that other and different. cattle were taken at the same time the cattle described in the indictment are charged to have been taken, or were found with the animals alleged to have been taken by the defendant, then you will not consider the evidence on this point as bearing against the defendant, except as it may tend to identify the transaction under investigation, or to explain the intent with which the defendant may have acted (if he had any connection with the taking of the cattle), or unless it tends to form a link in the chain of circumstances which may connect the defendant with the taking of the cattle in question. The defendant is on trial only for the taking of the cattle as alleged in the indictment, and not for taking anything else.

"The court further instructs the jury that it is necessary, in all cases, to prove the venue of the offense charged; that is, the State must show that the offense was committed in Gonzales county, or that at some time the defendant had possession of the cattle in Gonzales county. But the fact that the offense was committed at the place charged in the indictment may be proved by circumstances. It is not essential that it be established by positive evidence, if, from the facts in evidence and which appear affirmatively, you may reasonably conclude that the offense was committed in Gonzales county.

"If the jury find the defendant not guilty, they will so say in their verdict.

(Signed)                    "GEORGE McCORMICK, Judge," etc.

The special charges given in connection with the general charge read as follows:

"Before the jury can convict the defendant they must find from the evidence that the defendant was concerned in the original taking of the animals in question. Any subsequent connection with

the animals would not be sufficient to convict the defendant unless he was concerned fraudulently in the original taking; and upon this question the evidence must be sufficient to convince the jury of his guilt beyond a reasonable doubt."

" The burden of proof is at all times upon the State, and every material allegation must be proved by the State beyond a reasonable doubt before a conviction can be had."

The motion for new trial raised the several questions discussed in the opinion.

*Fly, Davidson & Davidson,* for tne appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.   1. In the indictment it was alleged that John and Fred Duderstadt were the owners of the cattle, and the proof showed that they had the possession, charge and control of the same.   Such being the case, it was unnecessary to prove want of consent of their father, Andrew Duderstadt, the real owner. (*Bailey* v. *The State,* 18 Texas Ct. App., 426; *Frazier* v. *The State,* 18 Texas Ct. App., 434.)

2. The third bill of exceptions, reserved to the testimony of the witness Trammel, is not well taken.   Witness had stated that he had bought certain cattle from defendant; that these same cattle were taken from his pasture by the officers of the law, and driven to Gonzales and put into the court-house yard, and that the Duderstadt boys took some of them away from the court-house yard.   If there is any appreciable objection to this testimony we fail to perceive it, and the exception fails to show it.

3. The fourth bill of exceptions was to the court's allowing the sheriff, Jones, to testify that he had received official notice that one Schneider had been released by other parties from the penitentiary, and was now a refugee from justice.   This evidence was admissible in view of the testimony of Mrs. House, defendant's wife, who stated that Schneider, a short time before a man came to her house looking for stolen cattle, had " brought some cattle to defendant's pen, put them into the pen, and branded them."

4. There was no error in refusing to let defendant's witness House testify as to self-serving declarations and statements made to witness by defendant, after defendant had parted with the cattle; and the declarations of Reinhardt Schneider about his purchase and claim to the cattle were hearsay and inadmissible.   The court did

not err in the rulings complained of in the fifth bill of exceptions.

5. The remark of the court when the prosecution objected to defendant's counsel asking leading questions of defendant's witness and wife, Mrs. House: "Let him go on; I have cautioned him several times. I reckon the jury have sense enough to know whether the witness is telling the truth or not," was not, in our opinion, a reflection upon the veracity of the witness. From the manner in which this matter is stated in the exception, we cannot see how or in what manner defendant under the circumstances shown could be seriously prejudiced.

6. The seventh, eighth and ninth bills of exception are complaints of remarks indulged in by the district attorney, the most objectionable of which perhaps was that "the State of Texas might be raked over with a fine-tooth comb, and a more notorious character than the defendant John House could nowhere be found." The objection to this remark, as stated in the bill, is that defendant's character had not been put in issue. True, his character had not been directly put in issue by himself. Still, the charge against him, and evidence which had been adduced to support it, were in their nature likely to reflect somewhat unfavorably upon his character, even if they did not put its notoriety throughout the State in issue. We construe the remark to be not so much evidence of a desire to make use of foreign matter to the injury and prejudice of defendant as an impassioned expression, highly exaggerated it may be, but springing inadvertently from the heat of debate. If all such remarks were held reversible error, but few convictions would stand the test where the case had been hotly contested by able and zealous counsel in the courts below.

The remarks set out specifically in the ninth bill of exceptions are rather deductions and arguments upon the evidence than mere opinions or independent statements by the district attorney. We cannot say they were entirely unwarranted by the evidence. With regard to this subject it was said in *Pierson* v. *The State*, 18 Texas Ct. App., 525, "in view of the frequency of exceptions of this character, we will take occasion here to say that before we will reverse a conviction because of remarks of prosecuting counsel it must clearly appear to us, 1, that the remarks were improper, and, 2, that they were of a material character and such as, under the circumstances, were calculated injuriously to affect the defendant's rights."

7. As to the charge of the court we think that, taking the two special requested instructions of defendant which were given in

connection therewith, it is a full and lucid exposition of the law of the case, and that the criticisms and refinements of counsel have failed to make apparent any radical defect either in substance or phraseology. We have already seen that the non-consent of the real owner, Andrew Duderstadt, was unnecessary to be proven under the facts disclosed. But, had it been necessary, we believe the charge of the court in that particular was the law applicable to the facts. As to accomplice testimony, we cannot well see how the instructions given could have been made stronger or plainer. The jury were told of the necessity for the corroboration of such testimony; that one accomplice could not be corroborated by the testimony of another accomplice; and that "within the meaning of accomplice as used herein is meant principal and joint offenders and all persons who may have participated in the commission of the offense under investigation, whether as principal offenders or in any other way connected therewith."

Instructions upon circumstantial evidence were not demanded by the facts, the case not being dependent wholly upon that character of testimony. When defendant was branding the animals and the witness Haldeman called his attention to the fact that they belonged to the Duderstadts, the defendant's reply, "d—n them, they stole their start," and that he was "going to get away with them," was equivalent to a positive admission that he had stolen them, and his declarations to the witness Kennedy aftewards amounted almost to the same thing.

8. But it is said the evidence fails to show that the taking was in Gonzales county or that defendant was ever seen in possession of them in Gonzales county. Defects pointed out in the companion case of *House* v. *The State*, 16 Texas Ct. App., 25, and upon which that case was reversed, seem to have been fully met and corrected in this case; and the facts before us do not make the case in any manner analogous to Long's case (11 Texas Ct. App., 381), or Tyler's case (13 Texas Ct. App., 205), cited by counsel for appellant. In this case the cattle ranged in Gonzales county, were seen by Fred Duderstadt on the accustomed range in Gonzales county, sucking their mothers, in February, 1883, were branded by defendant at his pen on the 10th day of February, 1883, when he admitted that he knew they belonged to the Duderstadts, and he intended to get away with them, and were afterwards found in Trammel's pasture, with the changed brand upon them. All the animals purchased by Trammel were driven by the officers taking possession of them from his pasture to Gonzales, and put into the court-house yard, where

they were identified, claimed and taken away by the Duderstadts as the animals in question. This evidence is amply sufficient to establish the identity of the animals and defendant's theft of them, though he may not have been seen by eye-witnesses when taking, or afterwards in possession of them in Gonzales county. There is no question but that they were stolen in Gonzales county, and the circumstances and defendant's admissions show him to be the guilty party.

We have been unable to find any reversible error in this record, and the judgment of conviction is therefore affirmed.

*Affirmed.*

[Opinion delivered October 31, 1885.]